**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
The Honorable Michael E. Romero

| | |
|---|---|
| In re: | Case No. 25-16381 MER |
| USA Cricket | |
| | Chapter 11 |
| Debtor. | |

## ORDER GRANTING MOTION TO APPROVE SETTLEMENT AGREEMENT AND MOTION TO APPROVE FINANCING

THIS MATTER comes before the Court on the Motion to Approve Settlement With American Cricket Enterprises, LLC Pursuant to Fed. R. Bankr. P. 9019(a) and to Assume the Binding Term Sheet in Connection Therewith Pursuant to 11 U.S.C. § 365(a) and Fed. R. Bankr. P. 6006 ("**Settlement Motion**"), the Motion for Entry of Order Authorizing Post-Petition Financing Pursuant to 11 U.S.C. §§ 105(a), 364(c)(1), and 364(e), Fed. R. Bankr. P. 4001(c) and L.B.R. 4001-2 ("**Financing Motion**") (collectively, "**Motions**") and the objections thereto.[1]

### BACKGROUND

The Debtor is the national governing body for the sport of cricket in the United States.  Pre-petition, the Debtor sought a commercial partner to help foster the growth of cricket.  The Debtor selected American Cricket Enterprises, LLC ("**ACE**") as its commercial partner, and the parties executed a term sheet on May 5, 2019 (the "**Term Sheet**").  Under the Term Sheet, the Debtor licensed to ACE the exclusive right to operate Major League and Minor League cricket in the United States for fifty years.  In exchange, ACE agreed to, among other things, fund certain team expenses, build a high-performance training facility, and build six additional stadiums.

Over the next few years, the Debtor's governance became increasingly dysfunctional.  This resulted in the suspension of the Debtor's International Cricket Council ("**ICC**") membership and loss of its United States Olympic and Paralympic Committee ("**USOPC**") accreditation.  Aside from the Debtor's internal turmoil, disputes with ACE also arose.  In particular, the Debtor accused ACE of not performing certain obligations under the Term Sheet, including failing to build a facility that could be considered a high-performance center and failing to timely make "commercially reasonable efforts" to build the six stadiums.  Eventually, the Debtor unilaterally

---

[1] ECF Nos. 205, 207, 235, 237, 246, 247, 248, & 249.

1

terminated the Term Sheet on August 21, 2025.  The Debtor then rescinded its termination on August 28, 2025, before re-terminating the Term Sheet on September 16, 2025.  The re-termination of the Term Sheet resulted in ACE commencing arbitration proceedings against the Debtor, as well as preliminary injunction proceedings in the Boulder County District Court (collectively, the "**State Court Proceedings**").[2]  The Debtor filed the underlying bankruptcy case only a few hours prior to a hearing on ACE's motion for a temporary restraining order.

The Debtor's dysfunctional governance and disputes with ACE followed it into this bankruptcy case.  The Debtor's CEO was furloughed at the beginning of this case, and the remaining board members became deadlocked and unable to make the decisions necessary for a successful reorganization.  This resulted in ACE filing a motion to revoke the Debtor's Subchapter V designation and to appoint a Chapter 11 trustee.  The Court granted ACE's motion after the Debtor failed to file a plan of reorganization within the ninety-day deadline prescribed by Subchapter V.  The Debtor's Subchapter V designation was revoked, and the Court approved the appointment of the Debtor's Subchapter V trustee, Mark Dennis, as the Chapter 11 trustee (the "**Trustee**").

The Trustee filed the instant Motions on April 13, 2026.  The Settlement Motion seeks approval of a settlement agreement between the Debtor and ACE, under which ACE will provide the Debtor with post-petition financing, and the Debtor will be required to assume the Term Sheet.  Additionally, ACE agrees to withdraw its proof of claim in the amount of $150,000,000.00. The parties agree to a mutual release of disputes that arose prior to the effective date of the settlement, including: (1) the Debtor's alleged termination of the Term Sheet; (2) the June 23, 2025, notice the Debtor sent to ACE regarding its alleged breach of the Term Sheet; (3) the Term Sheet in general; and (4) the State Court Proceedings (collectively, the "**Disputes**").[3]  The Settlement Motion drew a number of objections, including objections from several of the Debtor's board members, the Debtor's former counsel, Sesha Kalapatapu ("**Kalapatapu**"), and the National Cricket League ("**NCL**") (collectively, the "**Objecting Parties**").  The Court conducted an evidentiary hearing on the Motions, during which the Court admitted several exhibits and heard testimony from the Trustee and ACE's CEO, Johnathan Graves ("**Graves**").

---

[2] Case No. 2025CV3078.

[3] ECF No. 205, Ex. A, Settlement Agreement and Mutual Release, ¶¶ B-E & K.

## ANALYSIS

### A.      Applicable Standard

Settlements are governed by Fed. R. Bankr. P. 9019(a), which provides that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  The decision to approve or deny a settlement lies within the bankruptcy court's discretion.[4]  "As a general matter, settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."[5]  When deciding whether to approve a settlement, courts should consider the trustee's business judgment.[6]  However, the trustee's business judgment alone is not determinative of the court's decision to approve a settlement agreement.[7]  Indeed, "the court is not permitted to act as a mere rubber stamp, but must make an independent determination that the compromise is fair and equitable."[8]  When determining whether a settlement is fair and equitable and falls within the range of reasonableness, courts in the Tenth Circuit generally consider the factors outlined in *In re Kopexa*, including: (1) the probable success of the underlying litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; and (4) the interests of creditors in deference to their reasonable views.[9]  "Each factor need not be treated in a vacuum; rather, the factors should be considered as a whole to determine whether the settlement compares favorably with the expected rewards of litigation."[10]  Furthermore, the settlement need not be the best that the debtor could have obtained.[11]  "Rather, there is a range of reasonableness with respect to a settlement which recognizes the uncertainties of law and fact in a particular case and the concomitant risks and costs

---

[4] *In re Genesis Global Holdco, LLC*, 660 B.R. 439, 475 (Bankr. S.D.N.Y. 2024).

[5] *Id.* (quoting *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012)) (internal quotations omitted).

[6] *Id.* at 477.

[7] *In re Endoscopy Center of Southern Nevada, LLC*, 451 B.R. 527, 535 (Bankr. D. Nev. 2011); *In re HyLoft, Inc.*, 451 B.R. 104, 109 (Bankr. D. Nev. 2011).

[8] *In re HyLoft, Inc.*, 451 B.R. at 109 (citing *In re Rake*, 363 B.R. 146, 152 (Bankr. D. Idaho 2007).

[9] *Kopp v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997); *Roberts v. Sender, et. al (In re Roberts)*, No. 25-1103, 2026 WL 885070, at *3 (10th Cir. Mar. 31, 2026).

[10] *In re Open Medicine Institute, Inc.*, 639 B.R. 169, 180 (9th Cir. BAP 2022).

[11] *In re Genesis Global Holdco, LLC*, 660 B.R. at 476; *In re Stream TV Networks, Inc.*, 675 B.R. 1, 8 (Bankr. E.D. Pa. 2025) (quoting *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006)).

necessarily inherent in taking any litigation to completion."[12]  A court need only ensure the proposed settlement does not fall below the "lowest range of reasonableness."[13]

## B.     Standing

As an initial matter, the Court will address the issues regarding the Objecting Parties' standing.  The Trustee asserts that NCL, as well as objecting board members Venu Pisike, Srini Salver, and Anj Balusu (collectively, "**Objecting Board Members**"), do not have standing to object to the Motions because they are not "parties in interest" under § 1109(b).[14]  That section provides  "a party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."[15]  "The phrase 'party in interest' is a broad term.  Thus, when the Bankruptcy Code uses the phrase 'party in interest' it contemplates that the broadest category of potential litigants will have the Right to be Heard."[16]  The list of potential parties in interest set forth in § 1109(b) is not exhaustive.[17]  Rather, "[t]he general theory behind [§ 1109(b)] is that anyone holding a direct financial stake in the outcome of the case should have the opportunity (either directly or through an appropriate representative) to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest."[18]

Standing under § 1109(b) is distinct from Article III standing.  The Tenth Circuit Bankruptcy Appellate Panel has determined that Article III standing generally applies to bankruptcy courts.[19]  However, when a movant with Article III standing, such as the Trustee in this case, invokes the bankruptcy court's jurisdiction in a contested matter, it

---

[12] *In re Genesis Global Holdco, LLC*, 660 B.R. at 476.

[13] *Id.*; *In re Stream TV Networks, Inc.*, 675 B.R. at 8 (citing *In re Covenant Partners L.P.*, 555 B.R. 490, 493 (Bankr. E.D. Pa. 2016)).

[14] Any use of the term "Section" or "§" hereafter means Title 11 of the United States Code.

[15] 11 U.S.C. § 1109(b).

[16] *In re Riddle*, 671 B.R. 758, 765 (Bankr. D.N.M. 2025).

[17] *Truck Insurance Exchange v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 277 (2024).

[18] *Id.* (quoting 7 *Collier on Bankruptcy* ¶1109.01 (16th ed. 2023)).

[19] *In re Pettine*, 655 B.R. 196, 212-13 (10th Cir. BAP 2023) (finding Article III standing applies in bankruptcy cases).

4

is unnecessary to determine whether objecting parties also have Article III standing.[20] As such, the Court will only address standing pursuant to § 1109(b).[21]

It is unclear whether any of the Objecting Parties are "parties in interest" under § 1109(b). NCL was not a creditor when it filed its objection. Rather, NCL appears to be a competitor of ACE. NCL allegedly purchased two claims after it filed its objection. NCL did not file a notice of purchase of these claims, nor did it file copies of those proofs of claim. Instead, NCL attached two emails to its reply to the Trustee's omnibus response purporting to be from creditors who agreed to transfer their claims to NCL.[22] While NCL might have standing as a creditor if the purchase was complete prior to the May 18, 2026, hearing, it is unclear when or whether the purchase was complete.[23] Similarly, Objecting Board Member Venu Pisike ("**Pisike**") filed a proof of claim after the Court inquired as to his standing to object to the Motions. Pisike filed his proof of claim on May 8, 2026.[24] The deadline for filing proofs of claim was December 10, 2025. Pisike did not file a motion to allow a late-filed proof of claim, nor has the Trustee or any other party objected to the claim. If the proof of claim was disallowed, it is unclear whether Pisike, or any of the other Objecting Board Members, would have standing. Indeed, a debtor's former board members and officers typically lack standing to object, and even current board members do not automatically have standing.[25] Kalapatapu's

---

[20] *In re Riddle*, 671 B.R. at 763 ("It is unnecessary to determine whether Rainier and Wais independently satisfy the requirements of Article III standing. When a movant with Article III standing invokes the bankruptcy court's jurisdiction in a contested matter in a bankruptcy case, objecting parties need not themselves have Article III standing to prosecute their objections.").

[21] While bankruptcy courts, including courts within the Tenth Circuit, have held that a party must also have prudential standing, whether the Objecting Parties in this case have such standing is not at issue since none of the parties are asserting rights on behalf of third parties. *In re Riddle*, 671 B.R. 763-64 ("The traditional prudential standing principle that survived *Lexmark*—the general prohibition on a litigant raising another person's legal rights—is not an issue before the Court. Rainier and Wais are not asking to assert the legal rights of third parties."). As such, the Court need not address the issue of prudential standing.

[22] ECF No. 254, Ex. A.

[23] *In re Condere Corp.*, 228 B.R. 615, 624 (Bankr. S.D. Miss. 1998) (finding that court would not strike creditor's objection to motion to sell because even though it was not a creditor at the time it filed its objection, creditor filed notice of purchase prior to trial on the motion).

[24] POC No. 7-1.

[25] See *In re LTV Steel Co., Inc.*, 560 F.3d 449, 452-55 (6th Cir. 2009) (finding debtor's former board members did not have standing to appeal bankruptcy court's order dismissing motion to dissolve a committee because they were not persons aggrieved); *In re WHET, Inc.*, 33 B.R. 438, 442 (Bankr. D. Mass. 1983) ("Assuming, for the sake of argument only, that Martin-Trigona is the chief executive officer and president of WHET, Inc., his status as an officer of the debtor does not create a basis for standing."). Although the Objecting Board Members refer to themselves as "former board members," the Trustee stated at a prior hearing that the board has not been formally dissolved and a new board will be not be appointed until a plan is confirmed. Therefore, the objecting board members are legally current board members. The Court acknowledges, however, that there is some confusion regarding whether certain board members ceased to be on the board prior to the bankruptcy filing. In particular, ACE asserted at

standing is also uncertain. While Kalapatapu's law firm is scheduled as a creditor, it is unclear whether he objected to the Motions in his individual capacity or on behalf of his firm.[26] If he objected in his individual capacity, then it is uncertain whether he has standing because he does not have a personal claim against the Debtor.

Despite the open questions about standing, the Court, out of an abundance of caution, allowed the Objecting Parties to participate in the evidentiary hearing and has considered the merits of their objections. Ultimately, the Court need not determine the Objecting Parties' standing because, even assuming they are all "parties in interest," as more fully described below, the Court is not persuaded that their objections should be sustained.[27]

## C.     The Trustee's Business Judgment

The Court must first consider the level of deference it should give to the Trustee's business judgment. The Trustee, as the proponent of the proposed settlement with ACE, bears the burden of proving the settlement is "fair and equitable."[28] Some courts rely heavily on the trustee's judgment while others give it minimal deference.[29] Courts within the Tenth Circuit tend to afford a trustee's business judgment great deference when considering the beneficial nature of a proposed settlement.[30] However, a trustee's business judgment is not without bounds.[31] "There must be at least some rational business purpose to support the disinterested trustee's decision."[32]

---

the hearing that Mr. Balusu was no longer a board member when the bankruptcy petition was filed.

[26] Mr. Kalapatapu asserted at the hearing he has a personal claim against the Debtor because his firm is a sole proprietorship. The Court has not taken testimony or otherwise investigated whether these claims are true. As such, the Court takes no position as to whether Kalapatapu has a personal claim against the Debtor by virtue of the claim his law firm holds.

[27] See *In re Rake*, 363 B.R. 146, 152 (Bankr. D. Idaho 2007) (finding bankruptcy court would still address merits of motion to approve settlement motion even though debtor didn't have standing to object). Prior to the hearing, the Court determined that the Objecting Board Members participation would be limited to making a short statement regarding their position. At the hearing, the Objecting Board Members did not examine the Trustee or Graves.

[28] *In re Endoscopy Center of Southern Nevada, LLC*, 451 B.R. at 535 ("The party seeking approval of a compromise has the burden of persuasion."); *A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986).

[29] *In re HyLoft, Inc.*, 451 B.R. at 110.

[30] *In re Gordon*, 484 B.R. 811, 817 (Bankr. N.D. Okla. 2013); *In re Psychrometric Systems, Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (finding trustee's business judgment is to be given "great judicial deference" when deciding whether to grant the trustee's motion to sell estate assets); *In re Mountain States Rosen, LLC*, 619 B.R. 750, 754 (Bankr. D. Wyo. 2020) ("A debtor's business judgment enjoys great judicial deference, but this discretion is not without limit.") (internal quotations omitted).

[31] *In re Engman*, 331 B.R. 277, 300 (Bank. W.D. Mich. 2005).

[32] *Id.*

Additionally, "the decision process itself must evidence at least rudimentary due diligence."[33]  The Trustee's burden is not high; he need only show his decision is reasonable and made for a rational business purpose.[34]  In other words, the proverbial bar the trustee must clear to obtain approval of a settlement agreement is barely above the floor.  In this instance, the Trustee barely managed to limp over it.

It is clear the Trustee did the absolute minimum when assessing whether the settlement with ACE is fair, equitable, and in the best interests of the estate.  The Trustee testified he initially only considered obtaining post-petition financing from the ICC and ACE.[35]  However, the Trustee indicated his conversations with the ICC regarding the subject were brief and that he did not believe they would be fruitful.  After conversations with the ICC terminated, the Trustee turned to ACE.  ACE offered to provide the Debtor with the post-petition financing it so desperately needs in exchange for the Debtor assuming the Term Sheet and granting ACE the exclusive right to commercialize cricket in the United States for the next fifty years.  After obtaining a proposal from ACE, the Trustee testified he made no further effort to find prospective financers.  Instead, the Trustee testified he believed the best way to obtain competing offers was to file the Settlement Motion and see what proposals fell into his lap.  Aside from the Trustee's minimal effort to solicit a variety of financing options, the Trustee also did little due diligence in investigating the merits of ACE's claims and the Debtor's affirmative defense thereto.  Indeed, the Trustee testified he did not undertake an in-depth evaluation of ACE's claims or the Debtor's defenses because the proposed settlement resolves those issues.

Notwithstanding the Trustee's lackluster effort to solicit financing offers and evaluate ACE's claims, the Court concludes the Trustee's decision to enter into the settlement with ACE, nevertheless, shows at least rudimentary due diligence.  The Trustee testified that before deciding to enter into the agreement with ACE, he reviewed all the pleadings in the State Court Proceedings, had several conversations with the Debtor's CEO, other officers, and ACE regarding the Disputes, and had at least one conversation over the phone with Kalapatapu regarding the Debtor's stance on the Disputes.  At the hearing, the Trustee articulated a basic understanding of the Disputes and of what litigating them would entail.  The Trustee also testified he reviewed several invoices related to the Debtor's possible $1.2 million claim against ACE and discussed them with the Debtor's officers and ACE.  Furthermore, the Trustee testified that after he filed the Settlement Motion, he received an alternative proposal from NCL.  The emails between the Trustee and NCL show the Trustee engaged with NCL about its offer and advised it of the terms any competing proposal would need to include to be

---

[33] *Id.* (citing *In re Dalen*, 259 B.R. 586, 609-10 (Bankr. W.D. Mich. 2001).

[34] *Id.*; *In re Stewart*, 603 B.R. 138, 147 (Bankr. W.D. Okla. 2019).

[35] The Trustee also testified he had reviewed a financing offer from Offbeat Media early in the case while he was still the Subchapter V Trustee.  However, it appears from the Trustee's testimony that he didn't seriously consider the offer after he was appointed as Chapter 11 Trustee.

seriously considered.[36] The Trustee testified that while he reviewed NCL's proposals, he does not believe either proposal is a viable alternative to ACE's proposal. The Trustee asserts he does not believe NCL's proposals are viable for several reasons, including that accepting its proposal would create significant uncertainty around the litigation with ACE and the reinstatement of the Debtor's ICC membership. The Trustee further testified that he does not believe any other potential financers can provide an offer equivalent to or better than ACE's. Further, the Trustee's testimony demonstrates there is a rational business purpose in entering into the agreement with ACE, which is to: (1) fund the otherwise administratively insolvent estate; (2) facilitate reinstatement with the ICC; and (3) overcome the Debtor's largest roadblock to confirmation. In light of this testimony, the Court concludes that it will accord deference to the Trustee's business judgment in deciding whether to approve the Motions.

## D. The Kopexa Factors Weigh in Favor of Approval

While the Court will consider the Trustee's business judgment, it must make an independent determination whether the proposed settlement is fair and equitable.[37] As previously stated, the factors the Court must consider when deciding whether to approve a settlement agreement are: (1) the probable success of the underlying litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; and (4) the interests of creditors in deference to their reasonable views.[38]

### 1. Probable Success of the Underlying Litigation on the Merits

The first factor the Court must consider is the probability of the Debtor's success on the merits of the State Court Proceedings. In addressing this factor, the Court need not decide the merits of the claims, only the Debtor's probability of succeeding on them.[39] "To address this factor without determining the merits of the underlying case, the Court gives weight to the competency and experience of both the trustee and the trustee's counsel in supporting the settlement."[40]

---

[36] See Trustee's Ex. 18, April 2026 emails between the Trustee and NCL.

[37] *In re Endoscopy Center of Southern Nevada, LLC*, 451 B.R. at 536 ("These cases show that the court cannot solely approve the settlement based on the trustee's business judgment; it must make its own analysis."); *In re Rake*, 363 B.R. at 152 ("If the trustee has complied with the business judgment rule and is properly informed of the facts, the Court can turn its attention to the four-factored analysis under *Marples* and *A&C Properties*."). The factors set forth in *In re Marples*, 266 B.R. 202 (Bankr. D. Idaho 2001) and *A & C Properties*, 784 F.2d 1377 (9th Cir. 1986) are the same as those in the *Kopexa* case.

[38] *In re Kopexa*, 213 B.R. at 1022; *Roberts v. Sender, et. al (In re Roberts)*, No. 25-1103, 2026 WL 885070, at *3 (10th Cir. Mar. 31, 2026).

[39] *In re Brownlee*, 624 B.R. 920, 923 (Bankr. M.D. Ga. 2021) (citing *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990)).

[40] *Id.* (quoting *In re Gaddy*, 622 B.R. 440, 452 (Bankr. S.D. Ala. 2020)) (internal quotations omitted).

As discussed above, the Court is concerned with the Trustee's minimal due diligence in evaluating ACE's claims and the Debtor's defenses thereto. Nevertheless, it concludes he did enough investigation to give deference to his opinion.  The Court also acknowledges the Trustee is represented by competent counsel experienced in these matters.  As to the probability of success in the underlying litigation, the Trustee asserts that the outcome is uncertain and that, given the disputed facts and circumstances, there is a meaningful risk the Debtor will not prevail on the merits.  If the Debtor does not prevail, the Trustee asserts that the estate risks being exposed to significant damages and a multi-million-dollar claim.  Given the uncertainty of the Debtor's success in the State Court Proceedings, the Court finds this factor weighs in favor of approval.

2.      *The Difficulties in Collections*

This factor is not implicated in this case as the Trustee here is settling claims against the estate.  Therefore, the factor is neutral as to approval.

3.      *The Complexity and Expense of Litigation*

The next factor the Court must consider is the complexity and expense of litigating against ACE.  The Trustee testified that litigating against ACE would be costly and time-consuming.  Given the contentious relationship between the parties, the Court is inclined to agree with the Trustee.  The Trustee further testified he believes litigation with ACE will require the retention of one or more experts and involves several issues that are not "clear cut," including what "commercially reasonable efforts" entails.  Given these considerations, the Court concludes this factor weighs in favor of approval.

4.      *The Best Interests of the Estate and Creditors*

The final factor the Court will consider is the interests of creditors in deference to their reasonable views.  The Trustee asserts the proposed settlement is in the best interests of creditors and the estate because it provides $340,000.00 for payment of administrative and unsecured claims.  Without the settlement, the case is likely to be converted or dismissed, and creditors will receive nothing.  While the proposed settlement provides $340,000.00 for administrative expense claims and unsecured claims, unsecured creditors will receive little, if anything, after the administrative expenses are paid.  Indeed, the Debtor's bankruptcy counsel requested $58,878.50 in fees, and the Trustee testified at the hearing that his counsel is expected to request over $200,000.00.  The Debtor's CEO recently requested allowance of an $82,000.00 administrative expense, and the Debtor's corporate counsel has yet to file a fee application.[41]  While it's unlikely unsecured creditors will receive any portion of the

---

[41] The Court acknowledges the Trustee and ACE both objected to Mr. Atkeison's motion for allowance of an administrative expense on a limited basis.  Both the Trustee and ACE agree that Mr. Atkeison is entitled to an administrative claim, however, they dispute the amount of the claim. As of the date of this Order, the Court has not yet conducted a hearing on Mr. Atkeison's motion.

$340,000.00 contemplated in the settlement, the Court is cognizant that, without the settlement, the case will likely be dismissed or converted, resulting in all creditors receiving nothing.  The Court also recognizes, as previously discussed, that only parties with questionable standing as creditors objected to the Motions.[42]  None of the unsecured creditors listed in the Debtor's schedules objected, nor did the Debtor's only secured creditor.  While the Court does not believe unsecured creditors will receive any meaningful payment under the proposed settlement, the possibility that the Debtor may successfully reorganize is preferable to the case being dismissed or converted, which would result in unsecured creditors receiving nothing.  As such, the Court concludes this factor weighs ever so slightly in favor of approval.

All of the relevant *Kopexa* factors weigh in favor of approving the settlement, albeit barely.  There are undoubtedly several issues with the proposed settlement agreement and the Term Sheet, which are cause for concern.  However, the Court is cognizant it may not substitute its own judgment for that of the Trustee and that while the settlement is far from ideal, it need not be the best the Debtor could obtain.[43]  Rather, the settlement simply must not fall below the lowest point of reasonableness.  Here, the Court concludes the proposed settlement with ACE is not so unreasonable as to warrant denial.  Therefore, the Court will approve the settlement agreement.

## E.    The Proposed Settlement Does Not Constitute A Sub Rosa Plan

Aside from the reasonableness issues, NCL argues the Court should not approve the settlement because doing so would amount to a *sub rosa* plan.  NCL asserts the settlement amounts to a *sub rosa* plan because it dictates the structure pursuant to which ACE will provide funding, outlines the Debtor's future governance, and provides for long-term contractual rights.[44]  Therefore, the outcome of this case will allegedly be decided upon approval of the settlement.  The Trustee disagrees and asserts the settlement is not a *sub rosa* plan because it doesn't circumvent the requirements of

---

[42] As discussed above, Kalapatapu is the only objecting party who was a creditor at the time the Motions were filed. More specifically, Kalapatapu's law firm was listed as a creditor. Otherwise, NCL purchased its claims after it filed its objection to the Motions, and Pisike filed his late proof of claim only after the Court questioned his standing.

[43] *See In re 110 Beaver Street Partnership*, 244 B.R. 185, 187 (Bankr. D. Mass. 2000) ("In sum, the Court will defer to the trustee's judgment and approve the compromise, provided the trustee demonstrates that the proposed compromise falls within the range of reasonableness and thus is not an abuse of his or her discretion."); *In re Rake*, 363 B.R. at 152 (quoting *In re Arkoosh Produce, Inc*., 2003 WL 25273746 (Bankr. D. Idaho July 1, 2003) ("It is inappropriate for the court to substitute its own judgment as to the wisdom of a proposed settlement for that of the trustee. The Court need not engage in an exhaustive analysis of the law and merits of each claim, or the likelihood of the outcome, as doing so would in large part defeat the purpose of settlement. Rather, the court's role is to ensure that the trustee has exercised proper business judgment in making the decision to agree to the proposed settlement, and that the settlement falls above the lowest possible point in the range of reasonableness.").

[44] ECF No. 246 at 6.

§ 1129.[45]  Instead, the settlement specifically requires the Trustee to submit a plan that all creditors will have the opportunity to review and object to if they believe it does not meet the necessary confirmation requirements.

"*Sub rosa* plans are prohibited to prevent a debtor in possession from entering into transactions that will, in effect, short-circuit the requirements of Chapter 11 for confirmation of a reorganized plan."[46]  In other words, the doctrine prohibits efforts to restrict any rights afforded to creditors in the Chapter 11 process.[47]  When determining whether a settlement constitutes a *sub rosa* plan, courts consider whether: (1) the agreement has the practical effect of dictating the debtor's reorganization; (2) the agreement infringes upon creditor voting rights on the debtor's reorganization; (3) the agreement disposes of large assets belonging to the debtor; and (4) the agreement forces creditors to waive their claims against the debtor.[48]  "Nevertheless, courts have approved even large and important settlements prior to confirmation of a plan notwithstanding a *sub rosa* plan objection where settlements did not dispose of all of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization, or dictate the terms of a plan of reorganization."[49]

### 1.    Dictating Plan Terms

The first factor courts consider is whether the proposed settlement has the practical effect of dictating the terms of the debtor's plan.  "A settlement agreement proposed outside of the plan confirmation process, which has the practical effect of dictating the terms of a prospective Chapter 11 plan, constitutes an improper *sub rosa* plan and may not be approved."[50]  However, a settlement that is a "necessary step toward, or building block of, a plan of reorganization" does not constitute an improper *sub rosa* plan.[51]

While the proposed settlement with ACE undoubtedly dictates at least some terms of the Debtor's plan, it does not dictate all the terms.  There are issues beyond the resolution of ACE's claim that will need to be addressed in the plan, including reconstituting the Debtor's board of directors and addressing the over $100,000 secured

---

[45] ECF No. 250 at 26.

[46] *In re Genesis Global Holdco, LLC*, 660 B.R. at 486.

[47] *Id.*

[48] *Id.* (*quoting Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest II, LLC)*, 2011 WL 134893, at *11-12 (D. Conn. Jan. 14, 2011 (citing *Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997)) (quotations omitted).

[49] *Id.* (quoting *In re Tower Auto.*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006)) (internal quotations omitted).

[50] *In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014).

[51] *Id.* (quoting *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990)).

11

claim of AFCO Credit Corporation.  While resolving ACE's claim is undoubtedly the "principal plan issue," and the primary issue that could impede plan confirmation, this alone is not a reason to deny approval of the proposed settlement.[52]  Further, the terms of the settlement will only be incorporated into a plan filed by the Trustee on behalf of the Debtor.[53]  Nothing in the proposed settlement requires a competing plan filed by a party in interest to include the terms.[54]  Therefore, the settlement only dictates a handful of terms for a plan filed by the Trustee.  For these reasons, the Court concludes this factor weighs against finding a *sub rosa* plan.

### 2.    Creditor Voting Rights

The next factor courts consider is whether the proposed settlement infringes upon the creditors' rights to vote on a plan as they see fit.  Here, nothing in the settlement restricts creditors from participating in the plan process.  All creditors are free to negotiate regarding their particular treatment and to vote for or against the plan as they see fit.  As such, this factor weighs against the proposed settlement amounting to a *sub rosa* plan.

### 3.    Asset Disposal

The third factor is whether the proposed settlement disposes of large assets belonging to the Debtor.  Here, the only assets being disposed of are the Debtor's claims against ACE.  The Trustee testified at the hearing that while the Debtor's potential claim against ACE may be worth $1.2 million, the claim would need to be further investigated.  However, even if the Debtor's potential claim against ACE is its largest asset, that alone is insufficient to deny approval of the settlement agreement.  Courts have approved similar agreements so long as some estate assets remain.[55]  Because the proposed settlement would only dispose of one of the Debtor's assets, this factor weighs against a finding of a *sub rosa* plan.

---

[52] *Id.* ("Despite the Monitor's assertion that the PPI Dispute is 'the principal plan issue,' the Court observes that countless other plan issues remain outstanding. The PPI Dispute is a contentious issue which will impede a plan, but that is certainly no reason to deny approval of the Settlement Agreement.").

[53] ECF No. 205, Ex. A, ¶ 4(i).

[54] The Court previously revoked the Debtor's Subchapter V designation. As such, the Debtor is now proceeding under the requirements of a regular Chapter 11 case. Pursuant to 11 U.S.C. § 1121(c), any party in interest may file a plan so long as: (1) a trustee has been appointed under this Chapter; (2) the debtor has not filed a plan before 120 days after the date of the order for relief; or (3) the debtor has not filed a plan that has been accepted, before 180 days after the date of order for relief.  Here, a trustee has been appointed, and the exclusivity period for the Debtor to file a plan ran on January 29, 2026. Therefore, parties in interest are entitled to file proposed plans of reorganization.

[55] *In re Tower Automotive, Inc.*, 342 B.R. at 164 ("On the other hand, courts have approved even large and important settlements prior to confirmation of a plan, notwithstanding a *sub rosa* plan objection, where the settlements did not dispose of all of the debtor's assets . . . .").

### 4.      *Waiver of Claims*

The final factor is whether the settlement forces creditors to waive their claims against the Debtor.  The proposed settlement in this case only requires that ACE waive its claims against the Debtor in relation to the Disputes.[56]  No other creditors are required to waive claims they may have against the Debtor.  As such, this factor weighs against the settlement constituting *a sub rosa* plan.

Based on all these factors, the Court concludes the settlement is not a *sub rosa* plan, and NCL's objection on that basis is overruled.

## F.      Assumption Pursuant to Section 365

The Court will next address the arguments made by some of the parties regarding assumption of the Term Sheet under § 365(a) and (b).  Pursuant to § 365(a), "the trustee, subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor."[57]  Section 365(b)(1) lists the requirements for assumption of an executory contract:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

The Objecting Parties assert that the Term Sheet is an executory contract and, for the Trustee to assume it, all defaults under the Term Sheet must either be cured or the Trustee must provide adequate assurance of a prompt cure; the Trustee has done neither.  The Objecting Parties also contend the Term Sheet should not be assumed given the past disputes with ACE.  In response, the Trustee asserts § 365(b) is intended to protect the non-debtor counterparty to the Term Sheet (*i.e.,* ACE), not third-party

---

[56] *See Matter of Cajun Elec. Power Co-op., Inc.*, 119 F.3d at 355 (finding settlement that did not dispose of all claims against debtor did not constitute a *sub rosa* plan); *see also In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (finding bankruptcy court erred in approving transaction that provided for the release of claims by *all parties* against debtor, its secured creditors, and its officers and directors) (emphasis added).

[57] 11 U.S.C. § 365(a).

objectors who merely want to challenge ACE's track record.

The Court agrees that the purpose of § 365(b) is to protect the non-debtor counterparty to a contract who may otherwise wish to terminate its contractual relationship with the debtor.[58]  As such, the Objecting Parties' standing to object pursuant to § 365(b) is questionable, given that none of them are parties to the Term Sheet and thus have suffered no injury as a result of any default thereunder.[59]  Furthermore, case law is clear that the conditions set forth in § 365(b) may be either explicitly waived or deemed to have been waived by the non-debtor counterparty.[60]  Here, although ACE did not explicitly waive its right to cure or to provide adequate assurances, it has agreed to assume the Term Sheet without demanding additional cure or adequate assurances beyond those requirements set forth in the Settlement Agreement.  It is clear ACE wishes to continue its contractual relationship with the Debtor, given that it premised the settlement agreement on the Term Sheet being assumed.  This amounts to an implicit waiver of any additional cure or assurances under § 365(b).  Accordingly, the Court concludes that the parties' proposed settlement does not violate § 365.

## G.      The Financing Motion

Finally, the Court will briefly address the Financing Motion.  Through the Financing Motion, the Trustee seeks authority to borrow up to $480,000.00 from ACE pursuant to a Post-Petition Loan Agreement.[61]  This post-petition financing is part of the proposed settlement with ACE.  While some of the Objecting Parties objected to the Financing Motion, none of the objections are to the terms of the post-petition financing.  Instead, the objections to the Financing Motion are premised on the fact that it cannot be approved without first approving the Settlement Motion.  In other words, the objections to the Financing Motion are really objections to the Settlement Motion.  Because there are no substantive objections to the Financing Motion, the Court need not discuss it further.

---

[58] *In re National Gypsum Co.*, 208 F.3d at 509.

[59] *See In re George Washington Bridge Bus Station Development Venture LLC*, 65 F.4th 43, 51 (2d Cir. 2023) ("[W]e hold that, to receive priority under § 365(b)(1)(A), a creditor asserting a default must have some right to pursue a breach of contract claim under the executory contract or unexpired lease a debtor assumes under § 365(a)); *see also In re National Gypsum Co.*, 208 F.3d 498, 509 (5th Cir. 2000) ("Section 365(b)(1) provides a guarantee to the non-debtor party, who may be forced to continue a relationship it would rather terminate, that as condition to the forced continuation of the contractual relationship, all losses or defaults existing at the time will be satisfied either through a timely cure or through reasonable assurances of future payment.").

[60] *In re Harry C. Partridge, Jr. & Sons, Inc.*, 43 B.R. 669, 670 (Bankr. S.D.N.Y. 1984) ("Moreover, if the condition is excused, as in the case where the creditor either waives or is deemed to waive the condition for purposes of 11 U.S.C. § 365, as assumption of the executory contract or unexpired lease may be ordered without regard to the cure and adequate assurance requirements.").

[61] ECF No. 207, Ex. A.

## CONCLUSION

Given the above, the Court

ORDERS, the Settlement Motion is GRANTED, and the terms of the settlement between the Debtor and ACE are APPROVED.  The Court

FURTHER ORDERS the Financing Motion is GRANTED.

Dated July 2, 2026                                     BY THE COURT:

_____
Michael E. Romero, Judge
United States Bankruptcy Court